MÉNDEZ & Co., INC., demandante y peticionaria, *v.* FEDERICO HERNÁNDEZ DENTON, SECRETARIO DEPARTAMENTO ASUNTOS DEL CONSUMIDOR, demandado y recurrido.

*Número:* O-75-436          *Resuelto:* 19 de marzo de 1976

*Dubón & Dubón*, abogados de la peticionaria; *Wilfredo López Irizarry, Reynaldo Rodríguez Pagán, Samuel Martir Santiago, Mario Batiz Santos, Yusif Mafuz Blanco, Julio López Keelan, Migdalia Fratichelli*, abogados del recurrido.

El Juez Asociado Señor Negrón García emitió la opinión del Tribunal.

Como consecuencia de inspecciones realizadas por la División de Pesas y Medidas del Departamento de Asuntos al Consumidor (DACO), en dos negocios dedicados a la venta al por menor, se encontraron varios paquetes de una libra de granos de habichuelas coloradas y pintas y habas de lima empaquetadas por la peticionaria Méndez & Co., Inc., con un peso menor que el indicado en su rotulación. Le fueron imputadas dos infracciones a la Sec. 15 de la Ley Núm. 145 de 27 de junio de 1968([1])—Ley de Pesas y Medidas—consistente en "vender . . . [una] cantidad menor que la indicada para

---

([1]) 23 L.P.R.A. sec. 915 (suplemento).

cualquier artículo o servicio." La vista administrativa celebrada culminó con multas de $25.00 y $35.00 respectivamente.

Denegada la reconsideración administrativa y confirmado dicho dictamen por el Tribunal Superior, Sala de San Juan, a solicitud de la peticionaria Méndez & Co., Inc., expedimos auto de *certiorari* para examinar los méritos de sus señalamientos en el sentido de que las determinaciones de hecho del DACO no están sostenidas por la prueba y de que es inconstitucional, en su aplicación a la peticionaria, la Sec. 15 de la ley.

■ El primer planteamiento descansa en la tesis de que la mencionada Sec. 15 exige, para su infracción, que se pruebe que la deficiencia existía al momento de la venta. Nos propone que resolvamos que la comprobación o verificación del peso se haga en la fecha en que la mercancía es vendida al comerciante detallista.

■ La interpretación que se nos pide no se justifica ni jurídica ni pragmáticamente. La Ley de Evidencia (²) autoriza a hacer inferencias razonables de los hechos básicos probados; en consecuencia, como regla general, y en ausencia de una explicación adecuada, de la falta de peso al momento de la inspección, es sostenible la inferencia de que la misma ocurrió al momento del empaque, máxime si los paquetes no han sido abiertos. La posición de la recurrente de que la comprobación del peso se haga al momento de la venta, no sólo mutilaría en su implementación la facultad fiscalizadora del DACO en la protección del público consumidor—imponiéndole la casi imposible y onerosa condición de practicar su investigación según la conveniencia de los empacadores—sino que representaría una solución que no se deriva de los términos de la ley. Esta, por el contrario, al exigir en su Sec. 16 que en la parte exterior de todo paquete se haga constar en forma clara y conspicua el peso neto del producto, dispone que ". . . en los paquetes que no estén sujetos a la venta en el

---

(²)Ley de Evidencia, Art. 97 y 99 (32 L.P.R.A. secs. 1882 y 1884).

sitio donde se efectúa el empaque . . . [se indique] el nombre y la dirección del empacador o distribuidor . . . .", refleja el interés legislativo legítimo de que tal información esté disponible en todo momento para que de descubrirse una falta, puedan fijarse responsabilidades en todos los niveles de distribución de la mercancía.

El personal de la División de Pesas y Medidas utiliza para el repeso de los productos empacados las guías establecidas en el Manual publicado por el National Bureau of Standards intitulado, *Checking Prepackaged Commodities*. Independientemente de que el uso de este Manual sea el resultado de haber sido asimilado al Reglamento Núm. 9 de la agencia (T.E. pág. 24) o que responda a una práctica administrativa interna, el mismo está inspirado en los siguientes dos conceptos: (³)

(1) el promedio de los pesos de los artículos utilizados en la muestra no puede ser menor que el fijado en el paquete; y (2) no puede haber una falta de peso irrazonable en cualquiera de los paquetes tomados de la muestra. El Manual contiene una lista de márgenes de errores razonables, de más o de menos, según el peso del paquete. A paquetes como los

---

(³) En el idioma original, lee así en lo pertinente:

"There is presented here a method of control of prepackaged commodities (commodities put up in packages in advance of being offered for sale) for use by State and local weights and measures officials—a method based on two concepts:

"(1) Variations in quantities of package are not permitted to such extent that the average of the quantities in the packages comprising a lot, shipment, or delivery is below the quantity stated, and an unreasonable shortage in any individual package is not acceptable, even though overages in other packages in the same lot, shipment, or delivery compensate for such shortages. (This is the basic quantity requirement of the Model Regulation for Prepackaged Commodities adopted by the National Conference on Weights and Measures and of the Federal Food and Drug Administration.)

"(2) Perfection in either mechanical devices or human beings has not yet been attained; thus the existence of imperfection must be recognized and allowances for such imperfection must be made. These allowances are recognized in the 'average' concept." (Pág. 1.)

del caso de autos y aquellos cuyo peso oscila entre ocho onzas y 2 libras, se les ha fijado un margen de error de menos peso, de un cuarto de onza (4/16). Esta concesión de un margen de error razonable se hace en consideración a las posibles diferencias meditivas entre las máquinas comerciales usadas por la empacadora y la balanza empleada para cotejar el peso de cada paquete, y por estar consciente la agencia de los errores humanos en ambas operaciones así como de cuán efectivo de una medición precisa es el producto en particular al momento del empaque.

◾ Según la práctica administrativa del DACO, se escoge una muestra de los paquetes a ser inspeccionados y se entiende que se ha infringido la ley cuando alguno de los paquetes contiene menos peso que el supuesto, salvo que esté dentro del margen de error razonable de un cuarto de onza (4/16), en cuyo caso se considera si el peso *promedio* de los paquetes de la muestra, sumados los que tienen de más a los que tienen de menos ( + y — ), es inferior al indicado en su rotulación. Si el peso promedio es menor que el indicado en el paquete, se considera cometida la infracción.

◾ Conforme a esta práctica, se viola la ley de dos maneras: (a) cuando el defecto en el peso de un paquete sobrepasa el margen de error razonable o (b) cuando el peso *promedio* de los paquetes de la muestra (sumados + o —) resulta inferior al peso indicado en la rotulación. El método expuesto está reconocido en la mayoría de las jurisdicciones estatales norteamericanas y parte de la premisa de que resulta imposible para una agencia reguladora inspeccionar todos y cada uno de los paquetes que se venden, exige de los empacadores que mantengan a un mínimo el número de paquetes incompletos y les induce a añadir una cantidad adicional del producto en cuestión. Su razonabilidad estriba en que representa una medida de precaución para contrarrestar los errores humanos y mecánicos atribuibles al empacador a la par que les beneficia pues

no se le imputa automáticamente una violación de ley por el solo hecho de que un paquete no contenga el peso exacto rotulado—que no sea una deficiencia irrazonable—si la falta es subsanada por el resto de los paquetes de la muestra.

■ En su segundo planteamiento, la peticionaria argumenta que la prueba demostró que la falta de peso se debió a la resecación del grano de habichuela y por lo tanto, que la aplicación estricta de la ley, sin que se hubiese tomado en consideración esa pérdida natural de peso, constituye una privación de la propiedad sin el debido proceso de ley. Examinemos la validez del mismo.

Es un hecho incontrovertido y científico la naturaleza higroscópica del grano de la habichuela, esto es, presenta la característica de absorber y de exhalar la humedad según las circunstancias ambientales que le rodean. En consecuencia, el peso de las habichuelas disminuye paulatinamente a medida que se evapora la humedad intrínseca del grano, a tenor con las condiciones climatológicas de Puerto Rico. Un experimento realizado por el DACO, a sugerencia de la peticionaria, demostró que perdió 5/16 de onza en el lapso de cinco meses.

■ La validez de una reglamentación o práctica administrativa en este campo presupone el reconocimiento de unas tolerancias o variaciones permisibles por razón de la resecación natural del grano. En el caso ante nos, la agencia está facultada por ley para emitir Reglamentos en su implementación tanto para fines del público en general como para procesos internos. (23 L.P.R.A. sec. 906 (a) y 23 L.P.R.A. sec. 1005 (a).) Ni la ley ni su historial legislativo [4] dan margen para concluir que la agencia está carente del poder necesario para hacerla cumplir adoptando internamente aquellas guías y mejores prácticas administrativas que un sistema moderno de medición aconseje, sin perjuicio de que oportunamente sea divulgado para su mejor cumplimiento.

------

[4] *Diario de Sesiones*, Vol. 10, págs. 1213–1217 y 1933–1936 (1958).

· La norma rectora implica que tanto el comerciante como el consumidor deben soportar proporcionalmente las consecuencias del fenómeno higroscópico. El primero por las razones de control expuestas en la fase mecánica de empaquetar y el conocimiento del lugar de procedencia del grano y tipo de clima prevaleciente antes de ser introducido en nuestro país, circunstancia de gran importancia a los fines de determinar el grado de humedad; y el segundo, ante la realidad de que el grano vuelve a absorber la humedad perdida al procesarse para fines del consumo humano. Ello derrota el argumento de la peticionaria de que debe haber una tolerancia que guarde correspondencia matemática exacta entre el tiempo transcurrido y la resecación del producto a razón de 1/16 de onza por mes.

■ La jurisprudencia y la literatura más reciente consultada([5]) nos señala esa tendencia al reconocer variaciones razonables por pérdida y ganancia en la humedad del producto en el curso de buenas prácticas comerciales de distribución establecidas. El DACO así lo hizo, aumentando en mayo de 1972 el margen de error de menos peso a 6/16 de onza, ([6]) lo que constituyó propiamente la aceptación de la resecación del grano a los fines de implementar la ley. La deferencia que dicha agencia especializada merece, nos inhibe de intervenir con dicha determinación administrativa la cual se presume correcta. *Murphy Bernabe* v. *Tribunal Superior*, 103 D.P.R. 692 (1975).

---

([5]) *The Rath Packing Co.* v. *Becker, et al.*, U.S. Court of Appeals (9th Cir.) resuelto en 29 de octubre de 1975; *General Mills, Inc.* v. *Jones,* idem; *General Mills, Inc.* v. *Furness*, 398 F.Supp. 151 (1974). Manual 67 del National Bureau of Standards denominado *Checking Prepackaged Commodities*, Nov. 1975; *Model Weights & Measures Ordinance*, U.S. Dept. of Commerce (1975); *Model State Packaging & Labeling Regulation*, U.S. Dept. of Commerce (1975).

([6]) Sobre el particular su texto original dispone:

*"It will be noted that the suggested plus allowances are twice the suggested minus allowances at each 'labeled quantity'. This is an acknowledgment that packers must be allowed to overfill such packages as are susceptible of moisture loss.*

Bajo ningún supuesto, la peticionaria tiene razón. La relación cronológica relevante demuestra que en el caso P.M. 7813 las habichuelas fueron empaquetadas los días 22 de julio y 10 de noviembre de 1971, se vendieron al detallista los días 7 de octubre y 18 de noviembre de 1971 y la falta de peso se detectó el 17 de marzo de 1972, mientras que en el caso P.M. 7891 de habas de lima, la venta se hizo el 12 de noviembre de 1971 y el hallazgo el día 10 de abril de 1972; ([7]) o sea, un período de cuatro, cinco y seis meses después de las ventas es que, pesadas por el inspector del DACO, se determina la incongruencia entre el peso real y el peso rotulado.

■ A cada paquete se le aplicó al repesarse el margen de error de 4/16 de onza establecido en aquel momento, el cual posteriormente fue aumentado a 6/16. Si bien es cierto, como alega la peticionaria, que el testimonio del propio inspector de la agencia demostró que ningún paquete a la fecha del re-

---

"UNREASONABLE MINUS OR PLUS ERRORS

| "Labeled quantity | Minus error Greater than | Plus error Greater than |
|---|---|---|
| 0 to 2 ounces ........... | 1/8 ounce ............. | 1/4 ounce. |
| 2 + to 8 ounces ......... | 3/16 ounce ............. | 3/8 ounce. |
| 8 ounces + to 2 pounds .. | 1/4 ounce ............... | 1/2 ounce. |
| 2 + to 4 pounds ........ | 6/16 ounce ............. | 5/8 ounce. |
| 4 + to 7 pounds ........ | 3/8 ounce ............... | 3/4 ounce. |
| 7 + to 14 pounds ........ | 1/2 ounce ............... | 1 ounce. |
| 14 + to 24 pounds ....... | 3/4 ounce ............... | 1 1/2 ounces. |
| 24 + to 36 pounds ........ | 1 ounce ................. | 2 ounces. |
| 36 + to 51 pounds ........ | 8 ounces ................. | 1 pound. |
| 51 + to 101 pounds ...... | 2 pounds ................ | 4 pounds. |

"The figures offered above are suggested for the determination of the 'reasonableness' of errors in individual packages; they should not be used as tolerance figures." (Págs. 7–8, énfasis suplido.)

Aun cuando el récord está huérfano, resulta obvio que al aumentarse a 6/16 el error razonable por deficiencias, el margen de error por exceso debió aumentarse a 10/16.

([7]) No surge de la transcripción de evidencia de la vista administrativa, como tampoco de los demás documentos elevados ante nuestra consideración, la fecha exacta en que las habas de lima fueron empacadas.

peso había sufrido una merma en exceso de 5/16 de onza, tal conclusión únicamente es válida en lo referente a las habichuelas pintas ya que, con relación a las habichuelas coloradas y a las habas de lima, los informes de repeso de los paquetes en evidencia reflejan unos márgenes de error irrazonable en deficiencia en peso, [8] que aún aplicándole la norma que propone la peticionaria—a razón de 1/16 de onza mensual por el fenómeno higroscópico—la ubican al margen de la ley; [9] máxime si nos percatamos de que cualquier concesión en deficiencia por resecación necesariamente debe computarse a partir de la fecha en que el producto es vendido al detallista por estar hasta ese momento bajo el control exclusivo de la peticionaria.

En vista del análisis precedente, concluimos que el ataque de inconstitucionalidad que hace la peticionaria a la aplicación de la Sec. 15 de la Ley de Pesas y Medidas es infundado. *Se anula el auto de certiorari expedido y se confirma la sentencia del Tribunal Superior, Sala de San Juan.*

El Juez Asociado, Señor Martín, no intervino.

---

[8] El expediente administrativo sobre el particular refleja, indicadas en dieciseisavo de onza, las siguientes deficiencias en peso: *Habichuelas coloradas,* —8; —13; —6; —11; —12; —6; —1; —6; —9; —13; —11; —10; —13; —11; —11; —12; —19; —14; —9; *Habas de lima:* —13; —16; —13; —4; —8; —9; —6; —11; —12; —12; —14; —5; —12; —9; —12; —16; —11; —8; —10; —7; —8; —10; —8; —8; —15; —9; —11; —10; —12; —13; —7; —9; —6; —10; —9; —10.

[9] *Cf. El Pueblo* v. *Díaz,* 26 D.P.R. 279 (1918).